| UNITED STATES DISTRICT COURT | ONLINE PUBLICATION ONLY |
| --- | --- |
| EASTERN DISTRICT OF NEW YORK | |

-----------------------------------------------------------x

JESSICA SMITH,

                      Plaintiff,           MEMORANDUM AND ORDER

      -against-                         09-CV-4999 (JG)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                      Defendant.

-----------------------------------------------------------x

A P P E A R A N C E S:

    QUEENS LEGAL SERVICES
        42-15 Crescent Street, 9th Floor
        Long Island City, New York 11101
    By:    William Kaplan
        *Attorney for Plaintiff*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:    David M. Eskew
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Plaintiff Jessica Smith seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of the Commissioner of Social Security's denial of her application for disability benefits. The parties have cross-moved for judgment on the pleadings; the Commissioner seeks a judgment upholding his determination and Smith seeks a remand for further proceedings. I heard oral argument on May 14, 2010. Because the Commissioner's decision is not supported by substantial evidence in the record, I deny his motion. The cross-motion is granted, and the case is remanded to the Commissioner for further proceedings as detailed below.

BACKGROUND

On July 16, 2007, Smith applied for supplemental security income, alleging that she had been disabled since October 5, 2006 as a result of several severe physical and mental impairments. R. 65. Her claim was denied on October 25, 2007, R. 130, and no appeal was taken. Smith filed another application for supplemental security income on June 30, 2008, which was denied. R. 66. Smith requested a hearing before an administrative law judge ("ALJ"), at which she appeared and testified, represented by non-attorney Pauline Asemota, on May 26, 2009. R. 21-64. On July 2, 2009, ALJ David Nisnewitz concluded that Smith was not disabled within the meaning of the Social Security Act because she retained the residual functional capacity to perform the full range of medium work with mild non-exertional mental limitations as defined in 20 C.F.R. § 416.967(c), and therefore could return to her past relevant work as an administrative assistant. R. 5-20. The Appeals Council denied Smith's request for review on September 15, 2009, thus making the ALJ's adverse decision the final decision of the Commissioner. R. 1-3. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

A.   *The Plaintiff's Statements and Testimony*

Smith, who is 60 years old, suffers from major depressive disorder, generalized anxiety disorder, opioid abuse (in remission), diabetes mellitus, hepatitis C, low back pain, and fatigue. She also has a disputed diagnosis of osteoarthritis. She is an American citizen who was born in Egypt, went to school in Germany and Switzerland, and lived in France for a time. She is twice divorced and has one son.

Smith had a full work history from her arrival in the United States thirty years ago through 2001, when she was the victim of a severe car accident.[1] R. 30; R. 42. She worked as

---

[1] Smith does not allege that her injuries were caused by the accident, other than possibly her fatigue and back pain. *See* R. 30.

an administrative assistant in a law firm between 1983 and 2001, R. 24, and as a photojournalist between 1979 and 1992.[2] R. 27. After the car accident, she worked only part-time and had several periods of unemployment. R. 43. She worked four hours per day as a manager at a gourmet food store between May 2005 and August 2006, but stopped working there due to fatigue. R. 39. She then worked for a telemarketing company between July and December 2008, but was laid off from that position. R. 40.

In the mid-1980s Smith became addicted to heroin, although her addiction has been now in remission for several years. Her hepatitis C was contracted in the course of her heroin abuse. On January 16, 2005, Smith was arrested in possession of an Egyptian passport, a plane ticket to Kuwait, $20,000 in cash, and a credit card in her son's name. She was charged with credit card fraud and held at Riker's Island. R. 29. While there, she began exhibiting psychotic symptoms associated with heroin withdrawal and was transferred to the psychiatric ward of Elmhurst Hospital. She was treated with a combination of Haldol,[3] Cogentin,[4] Atarax,[5] and diminishing doses of methadone, a synthetic opioid prescribed to mitigate the effects of heroin withdrawal. R. 153. Smith continued to buy methadone on the street after she was released from Elmhurst.

On February 5, 2009, Smith filled out a disability questionnaire. She stated that she stayed in bed up to four days per week, avoided contact with people, had problems with concentration and memory, and was depressed and anxious. She reported that she bathed and

---

[2] The dates and nature of Smith's employment seem to be reported inconsistently throughout the record. I use here the dates and types of employment Smith claimed in her testimony before ALJ Nisnewitz.
[3] Haldol is an anti-psychotic drug. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000604.
[4] Cogentin is a drug ordinarily prescribed to Parkinson's disease patients to control tremors. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000595.
[5] Atarax is used to relieve itching caused by allergies and to control nausea and vomiting caused by, *inter alia*, motion sickness. It is also used for anxiety and to treat the symptoms of alcohol withdrawal. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000796.

groomed herself, although with difficulty due to her pain, and that she was able to use public transportation, although she was subject to constant dizziness. She also reported no changes in her activities of daily living since July 2008. R. 144-52.

At her hearing before ALJ Nisnewitz on May 26, 2009, Smith testified that she received regular monthly treatment for depression, and that she was also subject to hallucinations and panic attacks. She reported taking Lexapro,[6] Klonopin,[7] Ambien,[8] Metformin (Glucophage),[9] and Januvia.[10] R. 27. She asserted that she had stopped using heroin in December of 2004. R. 35. She further stated that she could not sit for more than two hours because of back pain, and she could not stand for long because she became tired. R. 35. She testified that she did not live alone and that she received help from a friend to go shopping. R. 37. She also testified that she no longer participated in activities that she once enjoyed, such as dancing. R. 36.

B.  *Medical Evidence*

   1.  *Treating Evaluations*

      a.  *Physical Evaluations*

On September 19, 2008, Dr. Emanuel Kouroupos, Smith's treating physician, reported diagnoses of insulin-dependent diabetes mellitus, back pain, hepatitis C, and possible

---

[6] Lexapro is a Selective Serotonin Reuptake Inhibitor ("SSRI") used to treat depression and anxiety. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214.
[7] Klonopin is a benzodiazepine used to control seizures, control panic attacks, and treat anxiety disorders. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635.
[8] Ambien is a sleep aid prescribed to help treat insomnia. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928.
[9] Glucophage is a medication used to treat type 2 diabetes mellitus by controlling the level of glucose in the blood. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000974.
[10] Januvia is used, along with diet and exercise, to lower blood sugar levels in patients with type 2 diabetes mellitus by increasing the amounts of "certain natural substances" that lower blood sugar when it is high. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000350.

intravenous drug addiction. He noted that she was prescribed Januvia, Glipizide,[11] and Glucophage. Her prognosis was listed as fair. Her fatigue was noted as constant, with depression secondary to fatigue. Her labs and neurology were normal, and there was no mental impairment. With regard to physical capabilities, Kouroupos reported that Smith was restricted to lifting and carrying five to ten pounds occasionally and ten pounds maximum, standing and walking less than two hours per day, and sitting less than six hours per day. Pushing and pulling were limited. R. 193-99.

In an April 20, 2009 report, Dr. Kouroupos stated that Smith could lift and carry ten pounds occasionally, sit one hour at a time and one hour in an eight-hour workday, and stand or walk for 15 minutes at a time and for one hour total in an eight-hour workday. She did not require a cane to ambulate. She could use her hands occasionally, but would never be able to use foot controls or perform postural activities due to osteoarthritis. He stated that Smith was totally restricted from work involving harsh environmental factors, unprotected heights, operating a motor vehicle, and climbing stairs and ramps. However, she could perform activities such as shopping, traveling alone, ambulating, walking at a reasonable pace over uneven surfaces, preparing a simple meal, taking care of her personal hygiene, and sorting and handling paper files. He concluded that Smith suffered from depression and anxiety. R. 314-18.

b. *Psychiatric Evaluations*

While in pre-trial detention at Rikers Island, Smith exhibited psychotic behavior consistent with heroin withdrawal. She was treated by medical staff at the New York City Department of Health and Mental Hygiene, Prison Health Services, and brought to Elmhurst Hospital's psychiatric division, where she was hospitalized for six weeks. During her treatment

---

11    Glipizide is a medication used to treat type 2 diabetes mellitus by causing the pancreas to secrete additional insulin. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000834.

she was evaluated by Drs. Raul Calicdan and Sarala Johnson, who diagnosed heroin abuse/withdrawal and depressive disorder not otherwise specified ("NOS"). Dr. Johnson, a psychiatrist, noted that Smith's orientation, appearance, psychomotor, attitude, speech, mood, affect, thought process, judgment, and memory were all normal, and that she was negative for delusions and hallucinations. Smith was assigned a Global Assessment of Function ("GAF") score of 55/70.[12] R. 226-28.

After being released from Elmhurst Hospital, Smith was referred to the Clearway Clinic in Brooklyn, a division of the Brooklyn Psychiatric Centers, by her Pretrial Services officer. She was diagnosed on March 14, 2005 with depressive disorder NOS, rule-out bipolar disorder NOS, and opioid dependence. She was assigned a GAF score of 55. R. 159-65.

In June of 2006, Smith resumed treatment at the Clearway Clinic, where Dr. Steven Newman performed a psychiatric evaluation. Smith was superficially cooperative with the evaluation, but she was at times guarded. He described her attention and concentration as mildly diminished and her speech and eye contact as within normal limits. Her affect was constricted and her thought processes were somewhat disorganized; her memory, judgment, and insight were deemed questionable. He noted that Smith denied hallucination, although she continued to express paranoid beliefs about her incarceration at Riker's Island; she also denied violent or suicidal ideation. Newman's diagnosis was dysthymic disorder, borderline and antisocial traits, and co-morbid mood disorder. He also diagnosed her with atypical psychosis and substance dependence, but qualified these conditions as in remission. Newman rated

---

[12] GAF rates overall psychological functioning on a scale of 0-100 based on occupational, social, and psychological performance. A GAF in the range of 51 to 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 34 (4th ed. rev. 2000). Where a GAF lists two numbers, the first number represents the current GAF and the second represents the highest GAF in the past year (*e.g.*, 50/60).

6

Smith's GAF as 50, and assessed her prognosis as guarded "due to long standing character issues, substance abuse, and comorbid mood disorder." R. 153-56.

In August 2008 Smith became a patient at the Queens County Neuropsychiatric Institute. She was diagnosed by Dr. Joseph Faillace, Ph.D., with major depressive disorder (recurrent), generalized anxiety disorder, and opioid abuse (in remission), and assigned a GAF of 60. Faillace noted that Smith also suffered from diabetes, hepatitis C, back pain, and vision problems, and that she reported fatigue, depression, and sleep difficulties. He further noted that Smith had been drug-free since January 2005, that she loved to dance, that she attended a club in Astoria, Queens, and that she stated that she could "get along with everybody." R. 201-03.

In a September 2, 2008 psychiatric evaluation, Dr. Tabare Hernandez, Smith's treating psychiatrist, indicated diagnoses of major depressive disorder and generalized anxiety disorder. Smith's GAF was noted at 50/50. Her speech was normal, she was well-groomed, cooperative, and oriented, and her thought content was appropriate. However, her insight was poor, and her mood was depressed and anxious. Hernandez noted her physical impairments of diabetes, hepatitis C, and back pain, and prescribed Lexapro, Trazodone,[13] and Ambien. R. 204-06.

In April of 2009, Dr. Hernandez filled out a psychiatric functional capacity report. Hernandez stated that Smith had a marked limitation in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions. He further stated that Smith was under a moderate limitation on making judgments on simple work-related tasks, interacting appropriately with the public, co-workers, and supervisors, and responding appropriately to routine work settings and changes in work settings. He

---

13  Trazodone is a serotonin modulator used to treat depression. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530.

described her symptoms as "significantly impact[ing]" her work capabilities, and stated that her "labile emotional moods and childlike often inappropriate responses" would have negative consequences in a job situation. Finally, he mentioned that her physical impairments prevented her from sustained activity, and that her medications and sleep difficulties would also make it difficult for her to maintain a job. R. 321-23.

2.   *Non-Treating Evaluations*

   a.   *Examining Reports*

On September 24, 2007, Dr. Jerome Caiati filled out an internal medicine consultation examination report. At Caiati's examination, Smith stated that she was unable to cook, clean, launder her clothes, go shopping, or care for her son, but that she could shower, bathe, and dress herself. Her stance and gait were normal, she could rise from a chair without difficulty, and her range of motion was normal. He listed diagnoses of obesity, diabetes, depression with history of drug abuse, and hepatitis C. He placed no limitations on her ability to sit, stand, walk, reach, push, pull, lift, climb, or bend. R. 166-69.

On that same date Dr. Arlene Broska, Ph.D., filled out a psychiatric consultative examination report listing diagnoses of dysthymic disorder, anxiety disorder NOS, and polysubstance abuse in remission, but stated that Smith's psychiatric symptoms were not significant enough to interfere with her ability to function on a daily basis. Broska noted that Smith had been prescribed Metformin, Glipizide, Lexapro, Ambien, Ibuprofen, and Gabapentin.[14] She found Smith to be responsive, cooperative and well-groomed, and found her thought processes and speech to be coherent. Smith's affect was of full range and appropriate, her sensorium was clear, and she was oriented. Her cognitive function, insight and judgment

---

14   Gabapentin is an anticonvulsant used to control seizures. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940.

were fair. She was able to dress, bathe, travel, and groom herself independently. She stated that she was often in pain, and only socialized with one friend. Broska found that Smith could follow, understand, and independently perform simple directions and tasks, maintain her concentration and attention, maintain a regular schedule, perform some complex tasks, and relate adequately with others. Finally, Broska stated that Smith was able to make "some" appropriate decisions in a working environment but may not be able to consistently deal appropriately with stress. R. 170-74.

Dr. Broska echoed her psychological findings in another report dated January 12, 2009, noting also Smith's physical diagnoses of diabetes, hepatitis C, chronic pain and fatigue, dizziness, and migraines. Smith again reported difficulty sleeping, normal appetite, depression, occasional anxiety, and fear. She was responsive, cooperative, and possessed appropriate social skills. Her speech was fluent, and her thought processes were coherent. Her affect, mood, sensorium, orientation, attention, concentration, and memory were all within normal limits. Her intellectual functioning was average, and her insight and judgment were fair. Smith reported that she could dress, bathe, and groom independently, prepare her own food, keep her home clean, and manage her own money. She reported spending her days using the Internet, listening to music, and sleeping. Broska reiterated that Smith was functional in most areas, but that she may not always deal appropriately with stress. She indicated that Smith could follow and understand simple directions and instructions, perform simple tasks independently, maintain concentration and attention, and relate adequately with others. She again noted that Smith's psychiatric symptoms were not significant enough to interfere with her ability to function on a daily basis. R. 279-83.

9

Also on January 12, 2009, Dr. Shahid Rasul filled out an internal medicine consultation examination report listing diagnoses of diabetes, hepatitis C, generalized fatigue and body pain, migraines, depression, and history of substance abuse. He noted that Smith reported a history of chronic pain all over her body, but sometimes localized in the shoulder region. She reported being able to cook, clean, do the laundry, care for her personal hygiene, and shop independently. She could walk five blocks before needing to rest, and could stand for 45 minutes before feeling tired. She had full range of motion in her body, and her neurological testing was normal. Her hand and finger dexterity were intact. Rasul concluded that Smith had no limitation in walking, lifting, carrying, sitting, standing, reaching, or fine motor activities of the upper extremities. R. 284-88.

  b. *Non-Examining Reports*

In a Mental Residual Functional Capacity ("RFC") Assessment signed on October 23, 2007, Dr. G. Wing, a Disability Determination Services ("DDS") psychiatric consultant, stated that Smith had a moderate limitation in her ability to understand, remember, and carry out detailed instructions, interact appropriately with the general public, and create realistic goals or plans independently of others. Other than those moderate limitations, Wing found no significant limitations on Smith's understanding, memory, concentration, persistence, social interaction, and adaptation. Wing stated that Smith was capable of performing some sort of substantial gainful activity. R. 175-78.

In another Mental RFC Assessment signed on January 15, 2009, Dr. C. Anderson, a DDS psychiatric consultant, opined that Smith had mild limitations in broad areas of functioning, such as understanding, memory, concentration, and persistence, and a moderate limitation in her ability to respond appropriately to changes in the work setting, set realistic

goals, and make plans independently of others. R. 304-07. Further, in a Psychiatric Review Technique form signed that same day, Anderson assessed as mildly restricted Smith's activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace. He noted no repeated episodes of decompensation. R. 290-303.

In a Physical RFC Assessment signed on January 15, 2009, Dr. W. Jaruch, a DDS Examiner, opined that Smith could lift and carry 50 pounds occasionally and 25 pounds frequently, and that she could sit for six hours and stand or walk for six hours in an eight-hour work day. Her ability to push and pull was deemed unlimited, other than such actions for lifting and carrying. She had no postural, manipulative, or environmental limitations. R. 308-13.

Dr. Alfred Jonas, a psychiatrist, appeared and testified at the hearing before ALJ Nisnewitz as a medical expert. He opined that Smith's psychiatric conditions did not comprise any of the defined severe impairments listed in the Listing of Impairments, 20 C.F.R. Part 404 Subpart P Appendix 1. He stated that, based on the medical and psychiatric evidence in the record, he could not identify any "meaningful psychiatric related functional impairment." R. 55. He further stated that he could find no limitations on Smith's RFC attributable to her diabetes or her hepatitis C. He concluded that Smith was overall "unimpaired," and that the limitations assessed by Dr. Hernandez, Smith's treating psychiatrist, were "excessive." R. 57.

Dr. Jonas also opined as to Smith's physical condition. He noted that her diabetes had not resulted in end organ damage, and that she had no limitations associated with her hepatitis C. R. 52. He noted that Dr. Kouroupos's diagnosis of osteoarthritis was the only such diagnosis in the record, and that both consultative physical examinations were normal; therefore he opined that osteoarthritis was not an "active diagnosis." R. 53.

11

DISCUSSION

A. *The Standard of Review*

To be found eligible for disability benefits, Smith must show that, "by reason of [a] medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 423(d)(2)(A).[15] On review, the question presented is whether the Commissioner's decision to deny Smith benefits is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 31 (internal quotation marks omitted).

The Social Security regulations direct a five-step analysis for evaluating disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant

---

15 Work may be substantial even if it is not full-time or if it generates less income or carries less responsibility than previous employment. 20 C.F.R. § 404.1572. *Id.* Work is gainful "if it is the kind of work usually done for pay or profit, whether or not profit is realized." *Id.* Activities such as household tasks, hobbies, therapy, school attendance, club activities, or social programs are generally not considered to be substantial gainful activity. *Id.*

> who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

*De Chirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks omitted); *see* 20 C.F.R. § 404.1520. The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

B.  *Analysis*

The ALJ followed the five-step procedure outlined above. He determined that Smith had not engaged in substantial gainful activity since June 30, 2008, the date of her application for benefits, and that she had "severe impairments" of diabetes, hepatitis C, depression, dysthymic disorder, generalized anxiety disorder, and substance use disorder. R. 10. He found that Smith had not credibly alleged that she suffered from a severe impairment of osteoarthritis, because her allegations were based on a single diagnosis from her treating physician and were not corroborated by the two consultative physical examinations of record. *Id.* He found that none of Smith's severe impairments met or medically equaled one of the listed impairments, R. 11, and determined that she had the RFC to perform the full range of medium work, R. 19; 20 C.F.R. § 416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."). At the fifth step, the ALJ concluded that Smith was not disabled under the Social Security Act because she

13

retained the residual functional capacity to perform the full range of medium work, with some non-exertional limitations imposed by her severe psychiatric impairments. R. 19-20.

1. *The Procedural Flaws in the Commissioner's Decision*

    a. *The Duty to Develop the Record*

An ALJ conducting an administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits. *See* 20 C.F.R. § 416.1400(b) (expressly providing that the Social Security Administration "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. . . ."); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Smith correctly argues that the Commissioner failed to develop the record enough to show that his decision was supported by substantial evidence.

The medical records submitted to the ALJ included only a small selection of Smith's presumably voluminous treatment records. ALJ Nisnewitz knew that Smith had been treated from 2005 to 2008 at the Clearway Clinic, and from 2008 through the hearing date at Queens County Neuropsychiatric Institute. Plaintiff Mot. at 12. She had been a patient of Dr. Hernandez for nearly two years, attending monthly appointments for examination and therapy. *See* R. 146. Further, the record indicates that Smith had been a patient of Dr. Kouroupos for a number of years prior to her application for benefits.[16] Despite his knowledge that there were

---

16    Smith alleges Dr. Kouroupos had been her treating physician since 1985 or 1990, and had prescribed medication for her diabetes. R. 136; R. 146. If so, there would have been 19 to 24 years of records for the ALJ to inspect. If Smith was incorrect about Kouroupos's tenure as her treating physician, as suggested by his statement that he had been treating her since 2006, R. 193, ALJ Nisnewitz was under an obligation to procure records from Smith's actual treating physician prior to 2006.

14

more records available for his inspection, the ALJ rested at least part of his determination on the supposed lack of record support for Smith's symptoms.  R. 17.

In response to Smith's contention that the ALJ failed to develop the record by obtaining Dr. Kouroupos's treatment records, the Commissioner first asserted that the administrative record indeed contains those records.  Reply Br. at 2 (citing R. 193-99, 314-19).  But, as the Commissioner's counsel conceded at oral argument, Dr. Kouroupos's treatment records were in fact not obtained; the cited pages of the record consist solely of residual functional capacity evaluations.  Counsel's alternative argument was that obtaining those records was unnecessary.  I respectfully disagree, both on general principles and more specifically in light of the ALJ's decision to disregard Kouroupos's diagnosis of osteoarthritis.  That diagnosis was disregarded by ALJ Nisnewitz when he assessed Smith's impairments.  The ALJ discounted Kouroupos's diagnosis, and the exertional limitations he found based on that diagnosis, because "the record reflected that the claimant had been diagnosed as having osteoarthritis on only one occasion," R. 10, and because two non-treating physicians did not make the same diagnosis.  This was error.  There is no rule requiring a claimant's impairments to be diagnosed more than once.  If the ALJ had questions or doubts about a treating physician's osteoarthritis diagnosis -- or whether the condition was "active," R. 18 -- he should have examined the physician's treatment records and addressed any remaining questions or doubts to that physician.  Here, the ALJ did neither.  Where a potentially dispositive issue could easily turn on information available to the ALJ, a proper development of the record requires the ALJ to obtain that information.  In this case, the ALJ's failure to obtain Smith's medical records requires a remand.

b.  *The Treating Physician Rule*

Under the regulations, a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" if it is "well [] supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations). The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling weight. He must also give "good reasons" for the weight actually given to those opinions if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician."). When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 416.927(d)(2)).

ALJ Nisnewitz failed to abide by the treating physician rule when he discounted the testimony of Drs. Hernandez and Kouroupos. He declined to give "great or controlling weight" to these treating physicians, and in fact gave them "lesser weight," because "they [were]

16

not supported by objective medical evidence and the other evidence of record." R. 18. Putting aside the deficiency addressed above, *i.e.*, the failure to obtain the treatment records that may have lent support to the treating physician's evaluation, the ALJ appears to have given improper weight to the consultative opinion of Dr. Jonas. Rather than relying on the examining sources more heavily than the non-examining sources, 20 C.F.R. §§ 416.927(d)(1), 416.927(d) (2), the ALJ gave "significant" weight to Jonas's opinion for no reason other than that Jonas was an "impartial medical expert . . . [who had] had the opportunity to review the evidence of record and listen to the claimant's testimony." R. 18.

Dr. Jonas's testimony appears to me to be afflicted by several defects: cherry-picking from the record, mischaracterizing the record, and placing weight (which was directly transported into the ALJ's decision) on facts in the record that do not bear that weight. One of those instances of cherry-picking enabled Jonas (and, in turn, the ALJ) to discount the impact of Smith's undisputed severe mental health impairments. Jonas opined that that he didn't "see what in this record . . . represents functional impairments on any basis," relying on a statement in a Queens County Neuropsychiatric Institute intake interview that Smith's strengths included her ability to "get along with anybody." R. 56 (referring to R. 203). That hardly seems fair to me, since on the same page there are statements attributed to Smith that she "[s]leep[s] a lot," "ha[s] no friends," cannot "motivate [her]self," and "[s]pend[s] too much time in bed."

As for mischaracterizing the record, Jonas testified that Smith "loves to dance and she goes to a Greek and Italian Club in Astoria *for purposes of dancing*." R. 56 (emphasis added) (again referring to R. 203). But the cited interview doesn't include the italicized language. Rather, it says, under the heading "Leisure/Social Activities," as follows: "Loves to dance. Goes to a Greek/Italian Club in Astoria." R. 203. It also says that Smith has no friends,

17

sleeps a lot, and can't see very well. It was not fair for Jonas to draw the conclusion he drew, particularly when he was present at the hearing and could have easily asked Smith whether in fact she were an active dancer, either at the time of the interview or at the time of the hearing.

Finally, Jonas -- and later the ALJ -- placed inordinate weight on a fact that simply doesn't bear it. In discounting Dr. Hernandez's assessment that Smith's mental health-related impairments significantly impacted her work capabilities by impairing her cognitive functioning, Jonas testified that, "[o]n the other hand, [Smith is] capable of managing her finances." R. 57. The ALJ referenced this testimony twice in discounting Hernandez's opinion. R. 16, 17. The sole support for Jonas's conclusion is a checked box at the very end of Hernandez's residual functional capacity questionnaire that indicates "yes" to the question of whether she can manage her benefits in her own interest. R. 323. Like me, the Commissioner's counsel at oral argument was uncertain as to precisely what that question addresses. Perhaps it pertains only to whether the benefit checks, if benefits are awarded, should be sent to the claimant or someone else. Perhaps, as Jonas appears to have concluded, it seeks to elicit (albeit in an odd way and without explanation) whether the claimant's wealth management skills are such that they undermine statements about cognitive deficits referenced elsewhere in the report. I doubt that, but of this I am sure -- before using that check-a-box answer as a fulcrum for disregarding Hernandez's opinion that Smith's work capabilities are "significantly impact[ed]" by "impair[ed] cognitive functioning" and "impairments in focusing and concentrating," the ALJ should have touched base with Hernandez to give him an opportunity to address what the ALJ felt was a discrepancy in Hernandez's assessment.

In sum, the treating physician rule requires a remand for proper application of the rule. Dr. Jonas's testimony was not a sufficient basis for refusing to accord controlling weight to the treating physicians' opinions.

CONCLUSION

The Commissioner's motion for judgment on the pleadings is denied. The plaintiff's cross-motion for judgment on the pleadings is granted. The case is remanded to the Commission for further proceedings consistent with this opinion.

                                So ordered.

                                John Gleeson, U.S.D.J.

Dated: March 31, 2011
       Brooklyn, New York